# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LUISA MARIA HERNANDEZ,

      **Plaintiff,**

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      **Defendant.**

**No. 15 C 0067**

**Magistrate Judge Mary M. Rowland**

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Luisa Maria Hernandez filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that

"any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on February 25, 2012, alleging that she became disabled on March 28, 2008, due to of a tear of her meniscus, high blood pressure, torn ligaments, and sleep apnea. (R. at 18, 211, 215). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 18, 81–112, 115). On August 16, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 18, 36–80). The ALJ also heard testimony from Lee O. Knutson, a vocational expert (VE). (*Id.* at 18, 70–80, 164). The Plaintiff, through her attorney, amended her alleged onset date to February 16, 2010. (*Id.* at 18, 253).

The ALJ denied Plaintiff's request for benefits on September 23, 2013. (R. at 18–30). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since the alleged onset date. (*Id.* at 20). At step two, the ALJ found that Plaintiff's obesity and arthritis are severe impairments, but her hypertension and sleep apnea are not. (*Id.* at 20–21). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 21–22).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum

> lift and carry 20 pounds occasionally and 10 pounds frequently and can
> be on her feet standing/walking about 6 hours in an 8-hour workday
> with normal rest periods and sit about 6 hours, with normal rest peri-
> ods. She is unable to work at heights or frequently climb ladders. She
> may occasionally kneel or crawl. She should avoid operation of moving
> or dangerous machinery or foot controls.

(R. at 22). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is able to perform past relevant work as a laundry aide/housekeeper. (*Id.* at 28). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ also determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including assembler, packer/garment folder, and mail room clerk/sorter. (*Id.* at 28–30). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (*Id.* at 30).

The Appeals Council denied Plaintiff's request for review on May 7, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

---

that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

On March 28, 2008, while working as a laundry technician in a nursing home, Plaintiff stepped on a ball and fell forward onto a table and then onto the floor with her leg bent in front of her. (R. at 47, 49, 51, 266). Plaintiff continued to work for the nursing home until she was terminated in February 2010 for unsatisfactory performance. (*Id*. at 53). During this time, the leg remained swollen, especially when she stood or sat for extended periods. (*Id*. at 266).

Plaintiff began treating with Helen Box, M.D., and other doctors at Erie Humboldt Park Health Center, in 2007. (R. at 257–317, 402). On April 20, 2010, Plaintiff reported that she had not been able to walk for the past two years due to her knee injury and complained of pain in her knee and lower leg. (*Id*. at 266). On examination, Dr. Box found her right knee swollen with some effusion, and despite full range of motion, there was pain over the medial joint line. (*Id*. at 267). She assessed chronic right knee pain and deteriorating obesity and referred Plaintiff for X-rays, physical therapy, and to an orthopedic specialist. (*Id*. at 268). On June 15, Plaintiff reported that she has been unable to do any exercises for her knee; she has pulling pain in the medial side of the knee which becomes worse when contracting her quad muscles. (*Id*. at 278). Dr. Box encouraged Plaintiff to do quad strengthening exercises. (*Id*. at 279). On October 25, Plaintiff complained of continuing right knee pain, which was not alleviated by Tylenol or a nonsteroidal anti-inflammatory drug

(NSAID) lotion. (*Id.* at 281). She has a knee brace but is not using it because it makes her leg feel tired. (*Id.*). On examination, Dr. Box found that Plaintiff's right knee was visibly swollen and warm with palpable effusion. (*Id.* at 282). Dr. Box assessed chronic right knee pain, injected the knee with triamcinolone,[3] ordered an MRI,[4] and encouraged Plaintiff to increase the number of leg lifts she was doing at home and to start using a cane. (*Id.*). On January 25, 2011, Plaintiff reported that her knee pain improved after the injection but worsened again in December. (*Id.* at 284). Dr. Box referred her for an orthopedic consult at Northwestern Medical. (*Id.* at 285)

On April 5, 2011, Plaintiff reported that while her knee brace helps, she still has trouble with stairs because of swelling in her knee. (R. at 288). At Plaintiff's request, Dr. Box gave her another knee injection and again recommended an orthopedics consultation. (*Id.* at 288, 290). On June 29, Plaintiff reported knee pain that is partially alleviated with ibuprofen. (*Id.* at 295). She is able to walk only three blocks before needing an extended rest into the next day. (*Id.*). In November 2011, a right knee arthroscopy repaired a torn meniscus. (*Id.* at 311, 319). On December 5, Dr. Box referred Plaintiff to an orthopedic specialist for a follow-up and for physical therapy. (*Id.* at 312).

In an adult function report dated April 23, 2012, Plaintiff reported that she cannot stand for a long period, kneel, squat, or walk too much because of the swelling

---

[3] Triamcinolone is a corticosteroid, which prevents the release of substances in the body that cause inflammation. <www.drugs.com> (last visited September 29, 2016)

[4] The MRI apparently found a meniscal tear in Plaintiff's right knee. (R. at 318–19).

in her knee. (R. at 229). Her ailments affect her ability to lift, squat, bend, stand, walk, kneel, climb stairs, and complete tasks. (*Id*. at 234).

On May 9, 2012, Plaintiff reported that the orthopedic specialist had diagnosed her with arthritis and numbness of her right knee. (R. at 323). She is able to do some knee exercises and a little walking. (*Id*.). On examination, Dr. Box observed that Plaintiff's right knee was wider than the left, and noted that there was a question of effusion on that side, as well as more pretibial edema on the right. (*Id*. at 324).

On May 10, 2012, Liana G. Palacci, D.O., reviewed the medical records and performed a consultative examination. (R. at 318–21). Plaintiff denied crepitus but complained of occasional swelling; she reported that walking and standing exacerbates her pain while lying down alleviates it. (*Id*. at 319). She denied any acute stress, lower body numbness or weakness, or needing a cane to ambulate. (*Id*.). On examination, Plaintiff was able to heel-and-toe stand and perform knee squats. (*Id*. at 320). Her gait was nonantalgic without the use of assistive devices, and the range of motion of her shoulders, elbows, wrists, hips, knees, ankles, and cervical and lumbar spine were all normal. (*Id*.). A straight leg test was negative and a neurological examination was normal. (*Id*.). Dr. Palacci assessed right knee pain, status post arthroscopy. (*Id*. at 321).

On May 16, DDS consultant Vidya Madala, M.D., reviewed the medical record and opined that Plaintiff has full range of motion in her knees, full strength, a normal gait without an assistive device, and no focal neurological deficits. (R. at 83).

She concluded that Plaintiff's medically determinable impairments do not cause significant limitation in basic work activities and are considered nonsevere. (*Id.*). On August 9, DDS consultant David Bitzer, M.D., affirmed Dr. Madala's assessment. (*Id.* at 100).

On July 28, 2012, Stephen Gryzlo, M.D., who was associated with Northwestern Medical, referred Plaintiff for physical therapy because of right knee chondromalacia and a recent hyperflexion injury after falling downs stairs because of quadriceps weakness. (R. at 411).

On October 1, Plaintiff reported pain in her right knee, exacerbated with walking, along with pain in her left ankle from a recent sprain. (R. at 412). Dr. Box observed minor swelling in Plaintiff's ankle, but found it stable, not hot or red, without pain upon dorsiflexion. (*Id.* at 413). She recommended that Plaintiff use an ankle brace and follow-up with her physical therapist. (*Id.*). An October 4 x-ray of Plaintiff's ankle indicated no fracture, with minimal soft tissue swelling. (*Id.* at 419).

On January 7, 2013, Plaintiff complained of knee pain, which is helped by exercises but exacerbated by walking and not alleviated with Tylenol. (R. at 428). On examination, Plaintiff had full range of motion. (*Id.* at 429). She denied swelling and reported that her knees don't give out or lock. (*Id.*). Dr. Box found a small effusion and a palpable Baker's cyst, noting tenderness along the joint line of the knee.

(*Id*.). A McMurray test was negative.[5] (*Id*.). Dr. Box assessed knee pain, more painful on left, and referred Plaintiff for physical therapy. (*Id*.). A subsequent MRI of the left knee on January 21 confirmed an effusion and a Baker's cyst, and revealed a grade-one MCL sprain and a meniscal tear. (*Id*. at 431).

On February 25, 2013, Plaintiff returned to Northwestern Medical complaining of chronic left knee pain, which swells up on occasion but no giving way, numbness, or tingling. (R. at 354). On examination, Joseph T. Boutet, a Certified Physician's Assistant,[6] found that Plaintiff can walk bearing her full weight without a limp. (*Id*.). Boutet noted that there was a slight effusion in Plaintiff's left knee, and that she was tender to palpitation over the medial joint line and significantly worse with McMurray testing. (*Id*.). She had full extension and flexion to 120°; MCL and LCL were intact to 0° and 20° of flexion; and her hips had full range of motion, no radiating pain, and negative log roll. (*Id*.). A review of the January 21 MRI revealed a medial meniscus tear, a grade-one sprain on the MCL and associated fluid around the MCL, as well as an effusion of the knee. (*Id*. at 355). Dr. Gryzlo recommended a left knee arthroscopy, debridement and partial medial meniscectomy, which Plaintiff underwent on April 5. (*Id*. at 355, 438). On April 15, Plaintiff reported doing

---

[5] The McMurray test "is used to evaluate individuals for tears in the meniscus of the knee." <https://en.wikipedia.org/wiki/McMurray_test> (last visited September 29, 2016)

[6] A Certified Physician Assistant (PA-C) "is a mid-level medical practitioner who works under the supervision of a licensed doctor (an MD) or osteopathic physician (a DO)." <http://www.storymedical.org/AboutUs/Definitions-of-Medical-Titles.aspx> (last visited September 29, 2016)

well, taking Norco only occasionally for postoperative pain.[7] (*Id.* at 360). Boutet prescribed physical therapy to increase her range of motion and strength. (*Id.*).

Plaintiff started physical therapy with Sonia Settler on April 16, 2013. (R. at 363). Plaintiff reported intermittent 5/10 pain when ambulating up and down stairs, during sit/stand transfers, and while bending or kneeling. (*Id.* at 366). On examination, she had decreased left knee range of motion (10–90°);[8] decreased left knee strength—flex and extension were 4/5; and gait dysfunction, including decreased heel strike, arm swing, and step length. (*Id.*). On April 23, Plaintiff reported increase range of motion, but still had strength limitations and difficulty negotiating stairs. (*Id.* at 371). On April 30, Plaintiff complained of soreness from her home exercises but no increase in pain. (*Id.* at 375).

On May 8, Plaintiff reported that her left knee was better than before her surgery but still feels unstable during physical therapy. (*Id.* at 441). Her right knee still bothers her a little. (*Id.*). She walks some but finds it difficult with her knee pain. (*Id.*). Dr. Box recommended that Plaintiff continue physical therapy and medications as prescribed by her orthopedist. (*Id.*).

---

[7] Norco is an opioid pain medication which contains a combination of acetaminophen and hydrocodone. <www.drugs.com> (last visited September 29, 2016)

[8] While a knee can fully flex up to 140°, only 60–70° of flexion are needed for normal walking, including up and down stairs, and about 90° to be able to rise from a seated position. *See* Brianne Grogan, *What Is the Normal Range of Motion of the Knee?,* available at <www.livestrong.com> (last visited October 3, 2016); Frank R. Noyes, M.D., *The Knee— Range of Motion,* available at <www.kneeguru.co.uk>; *accord McKinnes v. Colvin*, No. 12 C 2868, 2014 WL 1202968, at *4 n.6 (N.D. Ill. Mar. 21, 2014).

During her May 9 physical therapy session, Plaintiff reported pain only when going down stairs. (R. at 379). She complained of difficulty with step exercises secondary to pain, but pain was not worse upon completion of exercises. (*Id.*). On May 16, Plaintiff reported pain in the back of the knee while walking but otherwise only minimal pain during her exercises. (*Id.* at 383). Plaintiff was pain-free during her May 20 and 23 physical-therapy sessions, but noted difficulty walking longer distances. (*Id.* at 387, 391). At her final physical therapy session on May 28, Plaintiff reported a 75% decrease in her symptoms; she still has difficulty negotiating stairs and kneeling. (*Id.* at 395). On examination, her range of motion had improved to 130°, with knee flexion and extension rated 5/5, and no gait deviations. (*Id.* at 395).

On May 30, Plaintiff reported "doing well" with no need for any pain medications. (R. at 398). On examination, she was able to walk bearing her full weight without a limp. (*Id.*). Boutet found that her incisions had fully healed, with no effusion, no fullness posteriorly, no warmth, and no calf pain to palpation. (*Id.*). Plaintiff had full range of motion with her knee and her strength both flexion and extension were 5/5. (*Id.*). Boutet opined that no further physical-therapy sessions or medications were necessary but recommended that she continue her home exercises. (*Id.*).

On July 10, 2013, Dr. Box completed a Medical Questionnaire. (R. at 402–04). She reported that Plaintiff has knee pain, worsened by walking or prolonged standing, and needs to rest after walking two to three blocks or standing for 15 minutes. (*Id.* at 402). While Plaintiff needs a cane to reduce stress on her knees, she requires

only occasional Tylenol for her pain, which has stabilized. (*Id.* at 404). Dr. Box opined that it would be difficult for Plaintiff to find a job, since she would need to sit down frequently. (*Id.*).

At the August 2013 hearing, Plaintiff testified that she takes Tylenol for her knee pain, but is not prescribed any other pain medications. (R. at 56–57). She is able to carry up to one gallon of milk, which she estimated to be about ten pounds. (*Id.* at 61). She reported that she is able to walk a block at a time before needing to rest, and with a cane maybe two blocks. (*Id.* at 62–63). She is able to stand or sit for only ten minutes at a time, after which time her leg gets tired. (*Id.* at 63).

## V. DISCUSSION

Plaintiff argues that the ALJ failed to properly consider (1) the opinion of treating physician Dr. Box, (2) Plaintiff's credibility, and (3) Plaintiffs obesity in determining her RFC.

### A. Substantial Evidence Supports Weight Given to Dr. Box's Opinion

Plaintiff began treating with Dr. Box in 2007. (R. at 402). In July 2013, Dr. Box stated that Plaintiff's knee pain causes her to need to rest after walking for two to three blocks or standing for more than 15 minutes. (*Id.*). Dr. Box opined that it would be difficult for Plaintiff to work, since she would need to sit down frequently. (*Id.* at 404).

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physi-

cian." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted). In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

In his decision, the ALJ gave no weight to Dr. Box's opinion, finding it was

> not supported by Dr. Box's own records or the remainder of the objective evidence. As discussed above, Dr. Box alleges that [Plaintiff] has a learning disorder, but the record does not support this diagnosis. . . . Dr. Box [ ] opines that it would be difficult for [Plaintiff] to find a job that would accommodate her physical problems. However, this is a vocational issue that is outside Dr. Box's expertise. . . . Overall, the limi-

tations listed by Dr. Box are not supported by her own treatment records or the remainder of the evidence. In particular, her opinion is inconsistent with the most recent records from Northwestern, which reflect that [Plaintiff] had full range of motion with the knee, her strength was 5/5 for both flexion and extension, and she did not have a limp. For these reasons, I do not give weight to the opinion of Dr. Box, despite her treating relationship with [Plaintiff].

(R. at 27–28) (citations omitted).

Plaintiff contends that Dr. Box's opinion is "supported by treatment records and by medically acceptable clinical and laboratory diagnostic techniques consistent with the other substantial evidence in the record." (Dkt. 9 at 12). To the contrary, Dr. Box's treatment records do not include any objective evidence supporting her conclusion that Plaintiff would need to sit down frequently. Indeed, in the only testing of Plaintiff's knees performed by Dr. Box, she found in January 2013 that Plaintiff had full range of motion. (R. at 429). While Dr. Box assessed knee pain, she concluded that it could be alleviated with physical therapy and over-the-counter pain medication as needed. (*Id.* at 404, 429). Dr. Box never determined that Plaintiff needed—and there is no indication that Plaintiff requested—any prescription-strength pain medication for her knees. (*See id.* at 257–317, 323–33, 402–42).

Dr. Box's opinion was also inconsistent with other medical evidence cited by the ALJ. In May 2012, Dr. Palacci examined Plaintiff and found that she was able to heel-and-toe stand and perform knee squats without pain. (R. at 320). Her gait was nonantalgic without the use of assistive devices, and the range of motion of her shoulders, elbows, wrists, hips, knees, ankles, and cervical and lumbar spine were all normal. (*Id.*). A straight leg test was negative and a neurological examination

was normal. (*Id.*). In February 2013, PA-C Boutet found that Plaintiff can walk bearing her full weight without a limp. (*Id.* at 354). Her knee had full extension and flexion to 120° and her hips had full range of motion. (*Id.*). While Plaintiff's range of motion deteriorated temporarily after her second surgery (*id.* at 366), by May 2013 she was pain-free during her physical-therapy sessions (*id.* at 387, 391). At her final physical therapy session on May 28, her range of motion had improved to 130°, with her knee strength, both flexion and extension, rated as 5/5, and she ambulated with a normal gait. (*Id.* at 395). On May 30, she reported "doing well" with no need for any pain medication. (*Id.* at 398). On examination, Plaintiff was able to walk bearing her full weight without a limp, she had full range of motion with her knee, and her knee strength, both flexion and extension, were 5/5. (*Id.*).

Finally, the ALJ properly rejected Dr. Box's opinion that "it would be difficult" for Plaintiff to find full-time employment. (R. at 27) (citing *id.* at 404). "A statement by a medical source that [a claimant is] 'disabled' or 'unable to work'" does not mean that [the ALJ] will determine that [the claimant is] disabled." 20 C.F.R. § 404.1527(d)(1). Dr. Box has no expertise in determining whether there are jobs that someone with Plaintiff's limitations can perform. *See Schmidt v. Apfel*, 201 F.3d 970, 973 (7th Cir. 2000) ("The ALJ is under no duty to respect [ ] opinions that are given outside a witness' field of expertise."). Instead, the ALJ properly relied on the VE's testimony to determine that Plaintiff can perform her past relevant work as a laundry aide and other jobs in the national economy. (R. at 28–30); *see Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir.), *on reh'g*, 368 F.3d 691 (7th Cir. 2004)

(VE's "function in a social security disability hearing is to determine which jobs the applicant for disability benefits can do and how many such jobs exist").

Plaintiff contends that the ALJ improperly relied on the testing performed by PA-C Boutet, who is not a medical doctor. (Dkt. 9 at 11; Dkt. 15 at 6–7). To the contrary, while the finding of a certified physician's assistant "cannot establish the existence of a medically determinable impairment," information from PA-Cs "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Social Security Ruling (SSR) 06-03, at *2.[9] SSR 06-03 further explains:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

*Id.* at *3. Further, Boutet was part of team of doctors and other medical sources at Northwestern Medical who treated Plaintiff. (R. at 351–401). Thus, the ALJ properly considered the examinations performed by Boutet in determining the weight to be given to Dr. Box's opinion.

---

[9] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citations omitted); see 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

Plaintiff also argues that by rejecting Dr. Box's opinion, the ALJ was required to use a medical expert or DDS consultant to determine Plaintiff's RFC. (Dkt. 9 at 12). But the regulations contain no such requirement. In determining a claimant's RFC, "an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between [any of] the opinions [ ] of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). "Here, that is exactly what the ALJ did in weighing all of [Plaintiff's] physicians' opinions along with her testimony and the other record evidence." *Id.*

Finally, Plaintiff contends for the first time in her Reply that "Dr. Box's opinion regarding the presence of a learning disorder would also have been based on her longstanding observations and interactions with [Plaintiff]." (Dkt. 15 at 2). It is well settled that parties waive arguments raised for the first time in a reply. *See, e.g.*, *Argyropoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008); *Empire Elecs., Inc. v. D&D Tooling & Mfg., Inc.*, No. 13 C 376, 2014 WL 5819728, at *6 (N.D. Ill. Nov. 10, 2014). In any event, there is simply no mention of a learning disorder in *any* of Dr. Box's treatment notes. An ALJ may discount a treating physician's opinion if it is not supported by medical evidence or other basis to justify the conclusion. *Schmidt*, 496 F.3d at 842–43; *see Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir. 1994) (noting that ALJ did not err in discounting "cursory" medical evidence that was inconsistent with more recent examination performed by doctor who had been treating claimant for many years); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical

signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Further, it is Plaintiff's burden to establish that she has a learning disorder that prevents her from working. *Clifford*, 227 F.3d at 868.

In sum, the ALJ's decision giving no weight to Dr. Box's opinion is supported by substantial evidence. A reasonable person could find that Plaintiff's full range of motion, her knee strength rated as 5/5, and her normal gait all belied Dr. Box's opinion that Plaintiff must sit down frequently to rest her leg.

## B. The ALJ's Credibility Determination is Not Patently Wrong

The Social Security Administration determined recently that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of [the claimant's] symptoms." SSR 16-3p, at *2. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original).

The regulations describe a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR

16-3p, at *2; *see also* 20 C.F.R. § 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 16-3p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 16-3p, like former 96-7p, requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms

and how they affect the individual, and other relevant evidence in the case record."

*Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that she is unable to work because of sleep apnea. (R. at 57). She can lift and carry only 10 pounds, and can complete some housework with sufficient rest breaks. (*Id.* at 61). She ambulates with a cane and can walk only one block without it. (*Id.* at 62–63). She can stand or walk for only 10 minutes before needing a break. (*Id.* at 63).

In his decision, the ALJ found that Plaintiff's allegations "are not fully credible." (R. at 23). Specifically, the ALJ found Plaintiff's statements not credible because (1) "objective evidence does not support the severity of limitations alleged," (2) Plaintiff requires only over-the-counter pain medication, (3) she was noncompliant with medications and treatment, (4) she used a cane for only a short period of time, (5) she received unemployment benefits, and (6) her work history included inconsistent statements. (*Id.* at 23–24).

Not all of these reasons are legitimate. The ALJ did not take into account why Plaintiff was noncompliant with certain of her medications and treatment. While an ALJ can consider noncompliance when determining the credibility of allegations of impairment, he must not do so without first "considering possible reasons he or she may not comply." SSR 16-3p, at *8. On numerous occasions, Plaintiff complained of medication side effects and concern about taking too many drugs. (R. at 266, 275, 312, 412, 441). The ALJ must take into account that "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." SSR 16-3p, at *9.

Nevertheless, the ALJ otherwise supported his credibility determination with specific findings and substantial evidence. *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) ("But the standard of review employed for credibility determinations is extremely deferential, and the ALJ did provide some evidence supporting her determination."). As discussed above, the objective evidence demonstrates that Plaintiff has full range of motion and strength in her knees and walks with a normal gait. Her own statements indicate that she was doing well following her April 2013 knee surgery. (R. at 360). By May 9, she reported pain only when going down stairs, and she was pain-free during her May 20 and 23 physical-therapy sessions. (*Id.* at 379, 387, 391). And by May 30, Plaintiff reported "doing well" with no need for any pain medications. (*Id.* at 398).

Other than taking Norco only "occasionally" for a few days following her knee surgery, Plaintiff has never requested—or been prescribed—any prescription-

strength pain medication. Dr. Box noted that Plaintiff needs only "occasional Tylenol for pain." (R. at 404). The fact that Plaintiff relied on over-the-counter analgesics, which gave her relief, allowed the ALJ to properly infer that Plaintiff's level of pain was not severe. *See Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) ("Then the ALJ noted that Donahue relied for pain control on over-the-counter analgesics and reported that these gave him good relief, from which the ALJ inferred that the level of pain could not be severe."); *Jacoby v. Barnhart*, 93 F. App'x 939, 943 (7th Cir. 2004) (properly discounting allegations of pain where claimant "used only aspirin to manage his pain"); *Simpson v. Barnhart*, 91 F. App'x 503, 507 (7th Cir. 2004) ("The ALJ was free to infer that Simpson's pain was not severe because he was never prescribed pain medication and testified that he was able to control his pain symptoms by taking Tylenol.").

There is little evidence to support Plaintiff's contention that she can walk only one block without her cane. In May 2012, she denied needing a cane to ambulate. (R. at 319). Her gait was nonantalgic without the use of assistive devices. (*Id.* at 320). In February and May 2013, she could walk bearing her full weight without a limp. (*Id.* at 354, 398). While Dr. Box stated in her Medical Questionnaire that Plaintiff needs a cane to reduce stress on her knees (*id.* at 404), her treatment notes do not include any such recommendation. And even if Plaintiff does require a cane to walk more than one block, the VE testified that there are still jobs that she could perform. (*Id.* at 29, 75–77).

The ALJ properly relied on Plaintiff receiving unemployment compensation during 2011–2012—which required her to certify that she was able and willing to work—to discredit her credibility. (R. at 24). The Seventh Circuit has determined that ALJs may rely on this ability-to-work certification as "*one of many factors* adversely impacting [the claimant's] credibility." *Schmidt v. Barnhart,* 395 F.3d 737, 746 (7th Cir. 2005) (emphasis added); *accord Lott v. Colvin*, 541 F. App'x 702, 707 (7th Cir. 2013), *as amended* (Oct. 17, 2013). Here, the ALJ expressly stated that although Plaintiff's receipt of unemployment benefits was *a factor*, it was "not dispositive." (R. at 24). Similarly, the ALJ reasonably concluded that Plaintiff's ability to engage in part-time work in 2010–2011 undermined her testimony that she was unable to work at all after February 2010. (*Id.* at 24, 221, 281, 284, 286).

Under these circumstances, the Court cannot conclude that the ALJ's credibility determination was patently wrong. The ALJ supported his decision with specific findings, supported by substantial evidence. *Moss*, 555 F.3d at 561.

## C. The ALJ's RFC Assessment Properly Considered Plaintiff's Obesity

Plaintiff contends that the ALJ failed to take into account the impact of her "obesity on her ability to stand and walk throughout a workday." (Dkt. 9 at 12). She argues that the ALJ also failed to "adequately consider the combined impact of [Plaintiff's] obesity with her other impairments," especially fatigue, insomnia, and sleep apnea. (*Id.* at 12–13). Finally, Plaintiff asserts that the ALJ failed to "include any limitations with respect to concentration, persistence and pace related to the profound fatigue documented in the record." (*Id.* at 13–14).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence. The ALJ found that Plaintiff's obesity was a severe impairment and acknowledged her weight and body mass index throughout the decision. (R. at 20, 22, 24–27). He explicitly noted that he considered the entire, longitudinal record,

which included Plaintiff's obesity, when determining her RFC. (*Id.* at 24); *Sienkie-wicz v. Barnhart*, 409 F.3d 798, 802–03 (7th Cir. 2005) (ALJ found claimant was obese and nothing suggests that he then disregarded that finding when evaluating her RFC). The ALJ expressly determined that Plaintiff's obesity reduced her to a light exertional level and rejected the DDS consultants' opinions partially because they failed to take Plaintiff's obesity into account. (R. at 27).

Plaintiff appears to confuse conditions with disabilities. "A person can be de-pressed, anxious, and obese yet still perform full-time work." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). As the Seventh Circuit explained:

> Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work. This point is obscured by the tendency in some cases to describe obesi-ty as an impairment, limitation, or disability. It is none of these things from the standpoint of the disability program. It can be the *cause* of a disability, but once its causal efficacy is determined, it drops out of the picture. If the claimant for social security disability benefits is so obese as to be unable to bend, the issue is the effect of that inability on the claimant's capacity for work.

*Id.* (citation omitted) (emphasis in original). Plaintiff fails to demonstrate how her obesity combined with her other impairments impacts her ability to work. *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (claimant bears the burden to "articulate how her obesity limits her functioning and exacerbates her impairments"); *Prochas-ka v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (claimant must "specify how his obesity further impaired his ability to work") (citation omitted); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("Skarbek does not explain how his obe-

sity would have affected the ALJ's five-step analysis."). Indeed, despite her obesity, after her knee surgeries Plaintiff was able to walk bearing her full weight without any limp or abnormal gait, had full range of motion in her knees, and full strength in her extremities.[10]

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion to reverse the ALJ's decision and remand for additional proceedings [9] is **DENIED**, and Defendant's Motion for Summary Judgment [13] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

E N T E R:

Dated: October 11, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge

---

[10] For the first time in her Reply, Plaintiff contends that her sleep apnea, insomnia, and associated fatigue should have been considered severe impairments. (Dkt. 15 at 13). This argument is waived. *Argyropoulos*, 539 F.3d at 740. In any event, the ALJ must assess a claimant's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano,* 556 F.3d at 563. Here, the ALJ accommodated any limitations from Plaintiff's sleep apnea by restricting her to a limited range of light work with normal rest breaks. (R. at 21, 22). And, aside from her own statements, which the ALJ found not credible, Plaintiff does not demonstrate how her sleep apnea, insomnia, and associated fatigue would cause any further restrictions to her RFC.